It is our contention that the ALJ failed to properly consider two key medical opinions in assessing Mr. Bradshaw's mental residual functional capacity. The opinion of Dr. Thomas, the consulting psychologist, and the opinion of Dr. Landsberg, who is a treating family practice physician who was designated or listed as a psychiatrist, but he really is not a psychiatrist, he's a family practice physician. The ALJ restricted Mr. Bradshaw to simple routine tasks with minimal contact with the public and coworkers, and rejected Dr. Thomas's opinion, and claimed to give great weight to Dr. Landsberg's opinion, but did not include significant limitations also found by Dr. Landsberg. It's important to note that the Social Security rulings provide that there are three components to being able to perform the mental demands of unskilled work. The first component is to understand, carry out, and remember simple instructions, and it's undisputed that Mr. Bradshaw can do this. He can follow simple instructions, both these doctors said he could. But the second is to respond appropriately to supervision, coworkers, and usual work situations. Had Dr. Thomas's opinion been credited, he clearly could not engage in that activity. Could you point to the language in Dr. Landsberg's opinion that the ALJ didn't give sufficient weight to? Yes, on page 238 of the record, he had a medical source statement, and there are different definitions in this statement, and one of the definitions is fair, and that is the evidence supports the conclusion the individual's capacity to perform the activity is impaired. And Dr. Landsberg said it was impaired ability to perform activities within a schedule and maintain regular attendance, to complete a normal work day and work week without interruptions from psychologically based symptoms, and to respond appropriately to changes in a work setting. The third one is very important, because Solsky Ruling 8515, which I was referring to the three parts of the mental demands of unskilled work, the third component is you have to be able to deal with changes in a routine work setting. But Dr. Landsberg said it was fair, and is it your position that the ALJs in the RFC didn't take into account the fair capacity? Or is it that there was more development of what fair constituted that was required? Can you help me understand that? Which one? Both, because the definition says that it is impaired, but the degree, extent of the impairment needs to be further described. This is in the form. You have to look at fair has a different definition according to, but you have to look at what the form says the definition is, because that's what the doctor is answering the questions on the form. Well, we know that the government argues we know it wasn't poor, because poor would have been the other option. So it was somewhere between good and poor. Is that not sufficient? It's between good and poor, that's correct, but it's impaired, and it's impaired to the degree we do not know, because he never answered the question. But certainly it has, there's some limitation, and that is an important limitation to the ability to perform unskilled work as set forth in ruling 85-15, as I just mentioned. Now, the ALJ, the other thing that's very important to point out is that Dr. Thomas's opinion that Mr. Bracho had difficulties dealing with others is also supported by very important lay evidence from his, from two masters of counseling individuals who submitted reports in the record on pages 162 and 163. We have a letter from Stephan Gonzales, who has a dual diagnosis, drug and alcohol counselor, and then on page 163, a letter from Janice Shee, who has an MS in counseling. At the time both of these individuals wrote these letters, they had been working with Mr. Bracho for 18 months, and both of them found significant problems getting along with other individuals. For example, and this supports Dr. Thomas's opinion, for example, Can you explain to me Dr. Thomas's opinion, because she seems, she says it's mildly impaired, it's moderately impaired, or it's unlikely that he would be able to interact at all. So how do we make sense of this opinion? Is there a way to make it consistent? Well, Dr. Thomas, the limitation I'm speaking about is that he talks about that he was significantly anxious, it's unlikely that he would be able to interact with co-workers and the public. There are different components of work. So the doctor's describing different aspects of the functions of work. So he says it would be unlikely that he would be able to interact with co-workers on the job. But she says that he has the ability to accept instructions and interact with co-workers and the public. It appeared moderately impaired, not that he couldn't do it at all. So it was just, it was difficult for me to understand what her conclusion actually was. And then she says a GAF of 45, which is the ALJ, indicated is inconsistent with her other findings. Well, as I mentioned earlier, he can do simple work, but that's not the only analysis you have to look at. You have to also remember that the three components I mentioned at the outset, and clearly according to Dr. Thomas, he has a significant limitation, the ability to respond to supervision, co-workers in usual work settings. And that's a significant limitation and would be consistent with a GAF of 45 because the commissioner's regulations say a substantial loss to meet any of the basic work activities would severely limit the potential occupational base. And this can, so if just one, any of these work-related activities. Didn't the ALJ's RFC say that Mr. Bradshaw was limited to minimal contact with the public and co-workers? Why doesn't that take into account the two doctors' view that he was impaired or moderately impaired or had fair ability to interact with the public? So minimal contact, that it says he is limited to simple routine tasks and minimal contact with the public. So why doesn't that take it into account? Well, minimal contact is not no contact. It's quite a different thing. Well, neither doctor said no contact, right? They said it's moderately impaired. But it's unlikely to be able to interact. But that's only one of the three things she said. In the other places, she said it was moderately impaired. That's correct. But also overall, when you read the report, I think it does show significant limitations. And as I was mentioning, there's other evidence that shows the degree of limitations. And while non-acceptable sources cannot make a finding of a diagnosis condition, their opinions are entitled to wait under Ruling 063P. Well, I thought the ALJ said that there were gave reasons for rejecting them, but they were inconsistent with the ADLs that Mr. Bradshaw had indicated. The ALJ rejected them because he said they said he had concentration limitations. And Mr. Bradshaw stated on an activity living form that he could generally respond to directions. But that was written a couple of years ago. And we pointed out in our supplemental authority that there's a new recent Seventh Circuit decision, the case of Scrawham v. Colvin, it was referenced in our supplemental authority. But listen, did they have medical evidence in that case that there was evidence of progressive deterioration? Was there medical evidence of progressive deterioration in this case? Well, I think in general, the evidence is showing that clearly the laypeople I was explaining, they found he's quite significantly limited. They worked with him for these 18 months, and they both find that he has difficulty relating to people in an appropriate manner. He can be quick to anger. He has difficulty relating to authority figures and respond inappropriately to requests for his actions. He isolates. He avoids contact with others. They live with him. They work with him on a daily basis. So the ALJ said that's inconsistent with the ADLs in his testimony. And so then the question would be, well, was there, and the argument that was made in the brief for him that you made was that, well, those ADLs were a couple of years earlier. And so the question is, well, was there evidence in the record that he had progressive, a disease that was progressively deteriorating, like in the Seventh Circuit case? The what he said in the forum was that he was generally. Was there, though? Was there evidence of progressive deterioration in his condition, medical evidence? I think it shows, I think the evidence, his treating doctor shows he was, he actually got a prescribed additional medication. It's in the record that a year after Dr. Thomas evaluated the gentleman, he was, he was, on page 269 of the record, they prescribed Risperol, which is a medication because he was having disturbing dreams, depression with insomnia associated with disturbing dreams. So a year after Dr. Thomas evaluated him, now he's not, this is a regular general practice clinic. They prescribed additional medication, which would show he's gotten worse, because they increased his medication a year after he saw Dr. Thomas, was evaluated by Dr. Thomas. Ms. Bohr, I want to ask you, the, we're calling Dr. Landsberg the treating psychiatrist or psychologist, but he only saw the Mr. Bradshaw twice, according to my record, and it was early in the application process. I have him being seen by the quote, treater. That's what you're calling Landsberger, right? The treater? He was a treating family practice physician. Okay. He sees him on 7-2209 and 8-1909. And then I go to the, your citation of CFR-2404-1513-E2, where you talk about acceptable medical sources. And to me, the three reports detail the observations that are made of Mr. Bradshaw for 18 months by Mr. Costa. He's described in the record, and I'm now at page, I think, 134 of volume two. Costa is described as the manager. I assume that means the manager of the residential place where I'm at 134. Costa, of volume two, Costa says that he spends five hours a week with Bradshaw. And he says at page 138, Mr. Costa, who spends this time with him, says that Mr. Bradshaw is coming to realize he might not be able to work. At 139, he says he's disappointed that he's not able to work. Mr. Gonzalez, who is the dual diagnosis drug and alcohol treatment counselor, says that he's been the primary person for the last 18 months at the drop-in center. And then Jana Shea says she's the program manager at the Hotel de Riviera in Santa Barbara, describes her background. She says, I've been working as a healthcare provider for over 30 years. I've had significant contact and unique opportunity to observe him. The premise for my question is this. I went to the practice of social security law here. It says the reality of medical care in the era of HMOs and other managed care situations, that many people are prevented from actually seeing a physician until an insurance carrier allows them to. Hence, an increasingly large population may be seen initially and perhaps on a regular or prolonged basis by a nurse practitioner, a physician's assistant, or in mental health cases, a therapist who both treat and screen, who ultimately get to see, quote, the doctor. This is a real change from traditional medical practice. And while SSA definitions of acceptable medical sources has not appreciably changed, the reality of medical practice is who provides the medical care has. So I guess my question is, how does he get to see a doctor? Because it seems that Costa, Gonzalez, and Shea are the quote, treaters. Yes, that's correct. He only gets his medication from the clinic and he sees these therapists who all say he has significant limitations. I want to mention really quickly, I want to reserve a few minutes for rebuttal, if I may, that even if you accept the ALJ's RFC assessment, that he has minimal contact with the public, the two jobs that VE listed, both would require contact with the public, a cafeteria attendant job and an office worker, and we would contend that that's a violation of 0040. But I do want to reserve a few minutes for rebuttal. And also we did point out the credibility finding had some mistakes in it. The lower court initially found that the ALJ's finding on the credibility regarding his, for example, he didn't have a TENS unit and he wasn't taking potent medications, that that was incorrect because the man is an addict, he can't take potent medications, and there is evidence that he was on a TENS unit. The magistrate initially recommended remand. When objections were filed, he turned around, the magistrate changed her opinion and did an affirmance. So there is evidence in the record that the credibility finding was not supported by the record. I would reserve a minute for my rebuttal. All right. Good morning, Your Honors. I'm Jennifer Kenny on behalf of the appellee, um, acting commissioner of social security, Carolyn Colvin. The fundamental, um, I would like to add, I'd like to save two minutes for rebuttal. No, you don't get rebuttal. You're, you, you know, it's the way it works is she makes her argument and then you take all your time and then she gets rebuttal. So you have a whole 15 minutes. Thank you, Your Honor. Uh, the fundamental question before this court is whether the ALJ's interpretation of the evidence was reasonable and supported by substantial evidence. Here, claimant attempts to pluck the few positive clinical findings from the record without addressing them in context with the evidence as a whole. Review of the record, however, shows that the treatment notes from the period at issue from 2009 to 2011 were generally unremarkable and none of the six physicians who evaluated claimant's functional abilities found and precluded from all work. What, what do we do about the, um, Thomas's, um, statements, which include the statement that, um, as opposing counsel points out, it is unlikely that he would be able to interact with coworkers in the public. And as I pointed out, that's one of the three things she said, but the ALJ didn't expressly address that comment. He, he notes that she said that, um, he, he notes that she said that she said other things, um, he rejects her GAF score, uh, uh, because it's, um, inconsistent with, um, um, the ADLs and her other findings, but she, he doesn't reject that particular statement, uh, in, in his opinion. What do we do about that? Although the ALJ did specifically reject that portion, um, the ALJ accounted for any limitation that he would have dealing with, um, others by limiting him to minimal public contact. Well, she says one of the three or four things she says is it is unlikely that he would be able to interact with coworkers in the public. Then she goes on to say, um, moderately impaired, moderately impaired, um, but, but there is that one statement. So, um, uh, regarding his inability and clearly the RFC doesn't say no contact with the public, it says minimal contact with the public. Yes, Your Honor. The, to the extent that there was any ambiguity or conflict within Dr. Thomas's opinion, the ALJ was entitled to resolve those conflicts. Um, he was entitled, but did he do it? Reading it as a whole, reading her opinion as a whole, along with, um, considering all of the other evidence in the record, including all of the, the mental status exams, um, and the, and considering, um, the state agency psychiatrist who reviewed Dr. Thomas's opinion and found no significant, um, social limitations. The ALJ resolved, resolved that by accounting for any difficulties with the restriction to minimal public contact and minimal contact with coworkers. I have a question for you after hearing from Mr. Bradshaw's counsel about the meaning of this word fair, uh, which we see in evaluation of, um, Dr. Landsberg, would you comment on it? Um, you argue, I think that the fair doesn't equate with inability to work. Um, but she suggests that the meaning of fair and how it's used in the different documents, um, needs to be figured in. What is your response to that? Looking to the form itself, um, it is evident that the word fair does not mean inability to sustain. Um, there were other options on the form that the doctor could have chosen, including poor, which would indicate that the individual cannot usefully perform or sustain the activity. Um, Dr. fair. Um, and in light of the contemporaneous unremarkable mental status exam, uh, that Dr. Landsberg performed on that day, the ALJ reasonably determined that, um, any limitation was adequately accounted for with the limitation to simple repetitive tasks and, uh, minimal contact with the public and coworkers. So, so opposing counsel suggests that this has to be sent back to expand on what fair means, or that was one of the arguments. Um, are you, why, why wouldn't we do that? Given that the form itself says the degree extent of the impairment needs to be further described, and he didn't choose to describe it. There's no duty to further develop the record because there was enough information in the record for the ALJ to, um, determine whether disability existed, there was substantial evidence in the record to support the ALJ's determination that claimant was not disabled. We don't have it, you know, what's missing here is this expansion about, does he have this ability to respond, for example, to certain directions and changes in your workplace, or, um, you know, can he actually complete a normal workday in light of some of these psychological impairments, that's kind of what's missing from the so-called treating, um, doctor on whom the ALJ puts a significant reliance, at least in the mental field. The ALJ also relied on the state agency psychiatrist who specifically addressed those issues and determined that, um, claimant retained the ability to perform simple repetitive tasks. The, um, state agency psychiatrist, his opinion constitutes substantial evidence to support the ALJ's conclusion. Ms. Kenney, I want to ask you, I'm at page 15 now of the decision, and, uh, the ALJ repeats what, uh, is boilerplate for the most part, uh, says, however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not creditable to the extent they are residual functional capacity assessment. By the way, this appears in almost every decision. Am I correct? Judge Posner calls it not only boilerplate, but bad boilerplate, I think. Is, is, is, am I right that it appears in every decision? It appears frequently in decisions, but it is also- And so, oh, I'm sorry. You go ahead, you go ahead. I, I interrupted you. So here's what I want to know. There's no evidence in the record of malingering. What is the specific reason that's clear and convincing evidence that he should not be believed? The statement that the ALJ made on, on page 15 isn't the, isn't the end of the analysis of his adverse credibility determination, um, he continues on pages, um, 18 and 19 to provide additional analysis after having thoroughly detailed the, um, medical evidence of record. Um, for example, on page 18, the ALJ found that, the ALJ explained that the consultative evaluation noted a claimant's bilateral knee pain, but found no objective limiting factors. Um, in addition, in that same paragraph, the ALJ noted that he was not a surgical candidate and did not participate in significant forms of treatment commonly prescribed for intense and debilitating pain. But, but what's the reason he's not believed that he's reciting the medical, I agree with you. The ALJ recites the medical. What is the reason that the ALJ gives that he's not believed? Because he did not participate in significant forms of treatment commonly prescribed for intense and debilitating pain. Um, so the level of treatment that he received is not consistent with the debilitating pain that he's alleged. That's, that's one of the reasons. Um, in addition, the ALJ discussed his claims of fatigue, uh, and with respect to his hepatitis C, explained that there was no evidence of decompensation in the record. So let me just go back, kind of rewind to something you said. So if somebody doesn't participate in treatment that's consistent with their pain, they're therefore not credible? It is one of the factors that, um, an ALJ can consider in determining whether the allegations of pain are, are credible. Well, the first opinion of the magistrate judge said about that, and now I'm at volume one, page 97, quote, some of the reasons the ALJ gave for rejecting plaintiff's subjective pain testimony were based on misstatements of the record and are therefore not clear and convincing. The alleged error is with respect to the TEDS unit. Yeah. Um, the TEDS unit that claimant used was from approximately 2004. It's five years before the period at issue. Um, claimant testified that the TEDS unit was at least somewhat effective in controlling his pain. So despite that, he didn't ask or receive, uh, the TEDS unit during the relevant period, which was from 2009 to 2011. So the ALJ accurately said that he didn't use it during that period. Moreover, um, the TEDS unit in this circuit has been determined to be conservative treatment. So it doesn't negate the ALJ's overall analysis that, um, the level of treatment wasn't aggressive or assertive enough to, to, um, support the allegations of debilitating pain. Okay. To get back to Judge McKeown's question for a moment, at page 99, that judge says failure to do more than seek conservative medical care is an erroneous reason to disbelieve him. What do you, what do you say about that? It wasn't the only reason that the ALJ discredited claimant's allegations. There were several other reasons, um, in addition to the conservative. But, but could you answer the more specific question about the link between the nature of treatment and the credibility finding? But I know there are other credibility findings, but before you get to those. I'm not sure exactly what you want me to answer. Well, it's, it's really what Judge Pratt's question was. You were going on and said, yes, but then there's all these other credibility findings. So the question is, uh, we have from the magistrate judge, um, this question about how the nature of the treatment sought really undermines his credibility. And, uh, yours, and you didn't, haven't really responded to that more specific point.  Was there any evidence that he couldn't afford the treatment because we've said that, um, it's not, it's, it's less of an indication of credibility if he could, if there was evidence of the record that he couldn't afford the more aggressive treatment, was there such evidence here? There is no such evidence. Although, um, he was part of a homeless program at one time, the record is clear that there is lots of treatment that he received, um, consistently the entire time that he was, um, at the sober living facility. He continued to have treatment almost on a nearly basis, um, through February, 2011, and it had several of his complaints treated. Um, that was not an issue. So other than the tense issue or what, however you pronounce that was, um, was the ALJ's, um, determination that he had not sought aggressive treatment for his claims of pain. Was that supported by the record? Yes. Um, the record supports that there was, that he was not a surgical candidate and also that he did not, um, have any injections, um, as well. And we've held that that's one of the factors that the ALJ can consider in determining credibility. Yeah. Okay. Thanks. Ms. Kenny, I want to ask you, because I don't get the context of this, the vocational expert testimony, I'm at page 69, the ALJ, without any prompting, he asked the VE, uh, page 69 of volume two, examination of vocational expert by administrative law judge. He gives his past work, says he can't do it. He was an experienced carpenter and he can't do it. Then out of the blue, no question pending, the ALJ, I guess, announces, because it's not a question. Now, I will not put together counsel based on testimony because it's supported by the medical evidence. And obviously no judge, such a functionally restricted, no job, such a functionally restricted person could perform. Is the ALJ saying there's no job the fellow can do, the plaintiff can do? Or is he referring to carpentry? I mean, in context, it seems like he's referring to carpentry. Yeah. Yeah. That's the past relevant work, but I don't get the, what the ALJ is saying there, what's your understanding of that? My understanding was that, uh, it was clear to the judge that Klayman couldn't perform his past relevant work. He could? Could not. Could not. No, I understand that. And that shifts the burden to the commissioner, doesn't it? Yes. Okay. Obviously no job, such a functionally restricted person could perform. So does that mean if the ALJ believes the plaintiff, he qualifies for benefits? Is that what the ALJ is saying? Although the ALJ likely could have been more articulate, my understanding of what the ALJ said at the hearing was that it was clear to him that the Klayman couldn't perform his past relevant work. So, so we should read this as saying, um, it's supported by the medical evidence and carpentry is obviously no job such a functionally restricted person could perform. Is that your, is that how we should read it in your view? Yes. Given that it's a SVP of seven skilled, and that's also on page 69, um, he's limited to simple repetitive tasks. So given his, um. So the VE, um, says, um, this, his past relevant work is rough carpentry and explains that in the ALJ, um, makes his comment, which seems to say, uh, that carpentry is not a job that someone who's functionally restricted as Mr. Bradshaw is could perform. And then they go on, I believe, to determine what job he could perform. Now, can you respond to opposing counsel's comment that, um, uh, the VE erred in suggesting that, um, cafeteria work and the other was something that fit the RFC? The ALJ specifically asked, the ALJ presented, um, in a hypothetical to the vocational expert, the limitations that were supported by the record, which included the minimal contact with the public and coworkers. Having presented those limitations to the vocational expert, the vocational expert with 28 years of experience testified that such an individual would be able to do these jobs, including cafeteria worker and office worker. I thought one of the challenges was that the ALJ didn't include the minimal contact with the public. He did. Okay. Because that was one of their challenges. So, so if the VE, um, erred, you're saying that the ALJ was still entitled to rely on the VE's, um, uh, representation that he could do those functions? Yes. The ALJ specifically asked if there were any conflicts between the vocation expert's testimony and the dictionary of occupational titles and the VE testified that there was no conflict. Um, and I'm, I would like to point your honor to page 70, um, where the ALJ says, let's say this person is limited at most to simple routine tasks, minimal contact public and coworkers. So that was included in the hypothetical that was presented to the vocational expert. Ms. Kenney, how is it substantial evidence to leave out of the hypothetical question, the three people that had observed the plaintiff day in and day out for 18 months? One of the three people to whom I believe you're referring is Ronald Costa. He was the overseer at the, at the, um, sober living facility. And he supported the ALJ, uh, the claimant statements that he didn't have concentration problems. Right. But he, but the page before that, he said he had great fatigue, didn't he? Yes. Which the ALJ explained why was it was not credible. How is it substantial evidence to omit those three from the residual function of capacity finding of the ALJ and not be included in the hypothetical? Because they were not, uh, the ALJ properly rejected them. They weren't, those limitations were not supported by the record. And the ALJ only has to include those restrictions that are supported by the record. Were they deemed to be lay witnesses? Yes. They weren't. So he had to give germane reasons. Is that right? That is correct. And, and in your view, he gave germane reasons. What were the germane reasons that he gave? Uh, with regard to Ms. Level of concentration and attention were inconsistent with the claimant's own statements. In addition, they were also, their statements were inconsistent with the objective evidence of the record. Thank you. If there are no further questions, uh, the commissioner asked the court to affirm. Ms. That Mr. Um, Bradshaw's complaints are supported by objective evidence. The ALJ did not give a thorough discussion of the objective evidence that doc, the psychiatric signs described in Dr. Thomas's report where that's the most comprehensive and the only really comprehensive psychiatric evaluation, psychological evaluation. And also as, as judge Pratt has mentioned, the reports of the, the, um, lay individuals and they, they carry more weight than just a parent or a family member giving a statement under 0 6 3 P. They are providers of healthcare and they should carry more weight as long as they're, they can't give diagnosis, but their opinions of functional limitations should, should have been properly credited. But there, the evidence has other, um, shows that he had serious problems with his knees. He, there's an MRI of a lumbar spine, which was ignored by the ALJ. There's an x-ray of the right knee, which was not referenced by the ALJ. Abnormal findings. He has decreased sensation, problems with refluxes bilaterally, significant weakness, reduced range of motion, positive straight leg raising tests. These are all significant findings to support his subjective complaints regarding his physical impairments. And as mentioned earlier, the TENS unit reference was incorrect as well as, um, and the issue of the pain control was difficult for him because of his history of addiction. Um, I'd also wanted to quickly mention that even the hypothetical question, the ALJ did not include the limitations that he did credit from Dr. Landsberg. He credited the limitations. He said he'd give great weight to this doctor's opinion, but didn't include any limitations in dealing with, with, uh, changes in a work setting, completing a normal work week. We, even if it's just considered impaired, there is some limitation there, and it should have been asked to the vocational expert to determine how it would have affected the various jobs that were cited. There was no alternative RFC presented to the VE, was there? That's, I think, that's because of the ALJ's own statements. The ALJ said right up before the VE testified, which was mentioned by Judge Pratt, I will, uh, counsel based on the testament, because it's supported by the medical evidence, obviously no job such a person could perform. I'll just give one here until we get the new evidence. So I think it was assumed that it was going to be a favorable decision, to be honest, based on the judge's own statements. Thank you. Thank you. I'd like to thank both counsel for their arguments this morning. The case of Bradshaw versus Colvin is submitted.
judges: McKeown, Ikuta, Pratt